UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| PAIGE A. WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:15-CV-29-RLW |
| | ) |
| CAROLYN COLVIN, | ) |
| ACTING COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Paige A. Williams's ("Williams") application for disability insurance benefits and Supplemental Security Income.

**I.    Background**

Williams was born in 1971, and she alleged that she became disabled beginning November 14, 2011. (Tr. 13, 20). Williams alleged disability based upon depressive disorder, bipolar disorder, anxiety, and fatigue. (Tr. 157-63).

The Social Security Administration ("SSA") denied Williams' application for benefits, and she filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). The SSA granted Williams' request and a hearing was held on September 23, 2013. The ALJ issued a written decision on November 18, 2013, upholding the denial of benefits. (Tr. 8-21). Williams filed a timely Request for Review of Hearing Decision with the Appeals Council (Tr. 7). The Appeals Council denied Williams' Request for Review. (Tr. 1-3). The decision of the ALJ thus

stands as the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Williams filed this appeal on April 23, 2015.  (ECF No. 1).  Williams filed a Brief in Support of her Complaint on August 27, 2015.  (ECF No. 14).  The Commissioner filed a Brief in Support of the Answer on September 24, 2015.  (ECF No. 15).

## II.     Decision of the ALJ

The ALJ found that Williams had the following severe combination of impairments: major depressive disorder, recurrent (in partial remission) and panic disorder without agoraphobia.  (Tr. 13).  The ALJ, however, determined that Williams did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 14).  The ALJ found that Williams had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple, routine, and repetitive tasks, consistent with unskilled work as described by the Dictionary of Occupational Titles (DOT) and to superficial interactions with coworkers and the public, defined as casual and perfunctory interactions.  (Tr. 16).  The ALJ found that Williams was unable to perform any past relevant work.  (Tr. 20).  The ALJ determined that, based on Williams' RFC, jobs exist in significant numbers in the national economy that Williams could perform.  (Tr. 20).  Consequently, the ALJ found that Williams was not disabled.  (Tr. 21).

## III.    Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A.     Hearing Testimony

Williams testified on September 23, 2013, as follows:

Williams was born in 1971 and was 42 at the time of the hearing. (Tr. 35). She was five feet and four inches, and weighed 185 pounds. (Tr. 35-36). Her weight has gone up since she started taking Seroquel[1] and Epitol.[2] (Tr. 36). She says that taking Seroquel is worth the weight gain because it calms her racing thoughts at night, helps her to sleep, and eases her anxiety in the early morning. (Tr. 36-37). She began taking the Seroquel in July. (Tr. 37).

She takes Seroquel and Temazepam[3] at bedtime to help her rest. (Tr. 38). She takes Epitol when she wakes up at 10:00 or 11:00 a.m.; the Epitol has the side effects of fatigue and dizziness in the morning. (Tr. 38). She gets up late because she has a hard time going to sleep. (Tr. 38). It takes her around two hours to get to sleep, even with the Seroquel. (Tr. 38).

Williams had problems with Xanax. (Tr. 37). She last took Xanax two years ago. (Tr. 38). She stopped taking Xanax by herself after suffering withdrawal symptoms for two to three weeks. (Tr. 39). She took a prescription for Xanax from her employer, Dr. Kinim Smith. (Tr. 39). Williams signed the prescription. (Tr. 40). She was charged but not convicted. (Tr. 40).

Her husband has a hard time with Williams' issues because she loses all of her joy, but it is getting better with Seroquel. (Tr. 40). She has a 20 year old daughter, who attends Florida State University ("FSU"). (Tr. 40-41). She moved to Hannibal on August 13, 2010. (Tr. 41). She and her husband own a house. (Tr. 41-42). They own five acres of property and have four dogs. She likes to go out on the property and watch the dogs. (Tr. 42). Her husband works for the City of Hannibal but she does not work. (Tr. 42).

---

[1] Seroquel "is used to treat certain mental/mood conditions (such as schizophrenia, bipolar disorder, sudden episodes of mania or depression associated with bipolar disorder)." http://www.webmd.com/drugs/2/drug-4718/seroquel-oral/details

[2] Epitol "is known as an anticonvulsant or anti-epileptic drug. It is also used to relieve certain types of nerve pain (such as trigeminal neuralgia)." http://www.webmd.com/drugs/2/drug-10962/epitol-oral/details

[3] Temazepam is used to treat sleep problems (insomnia)." http://www.webmd.com/drugs/2/drug-8715/temazepam-oral/details

Williams alleges she became disabled on November 14, 2011 because that is when she realized she becomes really depressed if she is off her medication for two months. (Tr. 43-44). She has been married for three years. (Tr. 43). She is currently on Celexa, Restoril, Seroquel, Epitol, Tegretol, and Lisinopril. (Tr. 45). Williams states she cannot work even while medicated. Although she is on Seroquel for the last three months and it is working because she still has "really bad days." (Tr. 46). She still gets panic attacks, although they are improved. (Tr. 46). She could not go to see her daughter play softball at FSU in June because she "couldn't function." (Tr. 47). She's planning on traveling to FSU to see her daughter play soon. (Tr. 48-49).

She last used Xanax on the day she was arrested, November 14, 2011. (Tr. 49). She made sure that Dr. Spalding (at the Hannibal Clinic) did not give her Xanax because she became addicted. (Tr. 49).

She graduated from high school and got her associate's degree in the arts. (Tr. 53). She has no formal accounting training.

She previously worked at Watson Clinic from 2001 to 2006. (Tr. 50). She started in patient relations, where she handled customer service for patient billing. She later was promoted to attorney settlements liaison, where she tried to broker settlements with attorneys. (Tr. 50-51). She was promoted to reconciliation specialist, which included supervising the receptionists' accounting and posting of the copays. (Tr. 54). Then, she became team leader of patient relations where she oversaw patient relations. (Tr. 55). She was the collections supervisor from 2005-06, where she oversaw twenty-eight people. (Tr. 50, 55). She performed evaluations and had hiring and firing authority. (Tr. 55-56). She learned how to do all of these things on the job and never had any formal training.

In 2006, she started having difficulty performing her job. (Tr. 57). She was crying at her desk and depressed. (Tr. 57). She went back to being a collections analyst at a different clinic, Ascent Healthcare. (Tr. 57). She was there for six months. (Tr. 57). She left because she could not perform her job. (Tr. 57-58). She again was crying at work. (Tr. 58).

After that, she went to work as an office clerk, who helped out the office manager. (Tr. 58). She left on her own and got a job as a receptionist. (Tr. 58). Then she moved to Missouri and got a job as a receptionist for Dr. Kinim Smith. (Tr. 58-59). Dr. Smith, a rheumatologist, noticed that Williams was shaky and panicky and prescribed Williams Xanax. (Tr. 60). Williams said she did not tell Dr. Smith that she had an addiction to Xanax. (Tr. 61). Williams left that employment after she was arrested for forging the Xanax prescription. (Tr. 59). Working makes her condition worse because she cannot be around people. (Tr. 59-60).

She has mood swings all the time, even on Seroquel, but the mood swings are less frequent. (Tr. 61). She started feeling the effects of Seroquel about four weeks after taking it. (Tr. 62). She has more bad days than good days. (Tr. 64). On really bad days, she will call her husband at work every hour. (Tr. 64). She is not in counseling because she cannot afford it. (Tr. 65). She was denied Medicaid. (Tr. 65). She is not on her husband's insurance. (Tr. 65).

Vocational expert James Edmond Lanier testified as follows:

The ALJ asked Lanier to imagine a hypothetical person with Williams' work history. (Tr. 69). The first hypothetical person would be limited to simple, routine, and repetitive tasks consistent with unskilled work, as described by the DOT, and limited to frequent interaction with supervisors and coworkers, but occasional interaction with the public. (Tr. 69). Lanier stated that the hypothetical person could not perform Williams' past work. However, such an individual could perform medium work as a hand packer, hospital cleaner, or a kitchen helper.

(Tr. 69-70). The second hypothetical individual would have no exertional limitations but would be limited to superficial interaction with coworkers and the public, which is defined as casual or perfunctory interaction, but occasional interaction with supervisors. (Tr. 70). Lanier stated that the second hypothetical individual could still perform all of the work outlined for the person in the first hypothetical. (Tr. 70). The third hypothetical individual would be limited to simple routine and repetitive tasks from hypothetical number one, and such person would also be limited to occupations allowing the individual to work in relative isolation. (Tr. 71). Lanier stated that there are no jobs in the national economy that would allow that type of work based upon his professional experience and from the DOT. (Tr. 71).

Lanier also testified that if the hypothetical individual would be absent in excess of two days per month on a chronic basis then they would not be able to sustain competitive employment. (Tr. 71).

**B.  Medical Records**

Williams' relevant medical records are summarized as follows:

On November 14, 2011, Williams was admitted into the emergency room. (Tr. 289-93). Williams had been abusing Xanax for a month and was arrested for forging prescriptions. She was upset and began cutting herself superficially with a razor blade on the forearm. (Tr. 293).

On December 2, 2011, Williams was seen by Dr. Lyle Clark for depression and medication management. (Tr. 408-09).

On December 6, 2011, Williams and her husband filled out a Function Report and Function Report, Adult-Third Party. (Tr. 195-216). Both stated that Williams had no social interactions and Williams only watched TV during the day.

On January 18, 2012, Williams was seen by Dr. Clark for medication management. (Tr. 406-07).

On January 24, 2012, Mark Altomari, Ph.D. performed a Mental Residual Functional Capacity Assessment. (Tr. 300-14). Dr. Altomari discerned that Williams could perform simple instructions, interact adequately with others, and adapt to most usual changes common to a competitive work setting. (Tr. 302). Dr. Altomari found that Williams had moderate limitations in her daily activities, and in maintaining social functioning and concentration, persistence, or pace. (Tr. 311).

On November 26, 2012, Williams was seen by Joseph Spalding, D.O., for depression. (Tr. 402-05). It was noted she was last seen in January 2012 by Dr. Clark. She was diagnosed with major depressive disorder, recurrent in part remission, and panic disorder without agoraphobia. (Tr. 402). She reported difficulty sleeping but that her mood had been good with Celexa. (Tr. 402).

On February 7, 2013, Williams was seen by Dr. Spalding. (Tr. 398-99) She reported that she had been abusing Xanax. She reported major depressive disorder and panic disorder.

On May 6, 2013, Williams was seen by Dr. Spalding. (Tr. 395-96). She reported that she was going to Florida for 2 weeks.

On June 17, 2013, Williams was seen by Dr. Spalding. (Tr. 391-92). She reported racing thoughts, anxiety, and needless worry. She indicated that she could not shut her mind off and sleep, despite taking her medication. She was diagnosed with bipolar disorder.

In September 2013, Dr. Spalding provided a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (ECF No. 415-17). Dr. Spalding provided an opinion that Williams had marked limitations in interacting with others, and moderate to marked limitations

in performing complex instructions and making judgments on complex work-related decisions. (Tr. 415-16).

## IV. Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[4] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *see also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id.*; *see also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove

---

[4] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity*,* and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

disability, however, remains with the claimant." *Id.*; *see also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V. Discussion

### A. Development of the RFC

Williams contends that the ALJ failed to conduct a sufficient credibility analysis. (ECF No. 14 at 6). The ALJ determined that Williams retained the RFC to perform a range of simple work with limited interaction with others and at all exertional levels. (Tr. 16). The ALJ

discerned that that Williams could perform simple, routine, and repetitive tasks with superficial interaction with co-workers and the general public. (Tr. 16).

Williams argues that the ALJ erred in giving little weight to her treating psychiatrist Dr. Joseph Spalding's medical source statement. (ECF No. 14 at 6). As previously noted, Dr. Spalding authored a Medical Source Statement that opined Plaintiff had moderate to marked difficulties understanding, remembering, carrying out, and making judgments on complex instructions. (Tr. 415-17). Dr. Spalding stated Williams had major depression and panic disorder, depressed mood, anxiety, problems with concentration, shortness of breath, increased heart rate, diaphosesis, and that symptoms worsen when she in a work environment. (Tr. 415-17). Dr. Spalding also found Williams had marked limitations in interacting appropriately with the public, supervisors, co-workers, and responding appropriately to usual work situations and to changes in a routine work setting. (Tr. 415-17). The ALJ gave Dr. Spalding's analysis little weight because Dr. Spalding offered only a "minimal narrative explanation of the limitations he assessed and made no reference to his own treatment notes. His assessment is not entirely consistent with those treatment notes. There is little support for the extent of the social limitations he identified in the objective medical evidence." (Tr. 19).

Williams argues that the ALJ should have given Dr. Spaulding's Medical Source Statement greater weight. "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.' 20 C.F.R. § 404.1527(d)(2)." *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009). Williams contends that there is ample evidence in the record that she struggled with mental illness that caused limitations in her ability to function in the workplace. (ECF No. 14 at 10). Williams argues that

the ALJ did not fully consider Dr. Spaulding's previous treatment of Williams which bolsters his opinion. Williams contends that the ALJ should have evaluated factors such as the "length of the treatment, frequency of examination, nature and extent of the treatment relationship, support of the opinion afforded by the medical evidence, consistency of opinion with the record as a whole, and specialization of the treatment physician." (ECF No. 14 at 11). Williams claims that these factors weigh in favor of Dr. Spalding's opinion as he has treated her on a "regular basis for almost a year when he authored the MSS". (ECF No. 14 at 11). Williams further notes that Dr. Spaulding would have had access to Dr. Clark's notes because they worked at the same medical facility. (ECF No. 14 at 11). Accordingly, Williams contends that Dr. Spalding was in the best position to evaluate Williams' limitations. (Tr. 14 at 11).

In addition, Williams asserts that the ALJ failed to cite "specific reasons" for the credibility finding. (Tr. 14 at 11). Williams claims that the evidence showed that she was unable to sustain improvement, despite taking her medications as directed. (Tr. 14 at 12). Williams further notes that, although Williams had higher Global Assessment of Functioning ("GAF") scores, ALJs are "always quick to point out when the scores are below 50 that GAF scores have limited value as opinion evidence as they are essentially snapshot estimates of an individual's level of functioning on the day of the assessment." (ECF No. 14 at 12). Likewise, Williams notes that GAF scores have a "subjective component and vary between different mental healthcare providers, which lowers the reliability of the evidence." (ECF No. 14 at 12). Williams further contends that her mental health symptoms are not merely situational stressors but that she was unable to deal with life's stress because of her mental illness. (ECF No. 14 at 12). Finally, Williams asserts that her volunteerism at the bus barn is only referenced once on

12

October 29, 2012 treatment note and cannot be used as a basis to find she can perform full-time work. (ECF No. 14 at 12-13).

The Court holds that in finding that Williams was capable of a range of simple work with limited interaction with others, the ALJ considered the record as a whole, including Williams' subjective complaints. (Tr. 13-20). "Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). "The duty of deciding questions of fact, including the credibility of [Williams'] subjective testimony, rests with the Commissioner." *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." *Gregg*, 354 F.3d at 714 (citing *Russell v. Sullivan,* 950 F.2d 542, 545 (8th Cir. 1991)).

The ALJ properly considered that Williams' allegations were not entirely credible. (Tr. 17, 20). The ALJ determined that Williams' complaints were inconsistent with the record as a whole, including the medical opinions, his medical treatment, the medical evidence, and her daily activities. (Tr. 13-20).

The ALJ evaluated Dr. Spalding's medical opinions, but found them entitled to little weight, and the ALJ gave the opinions of Dr. Altomari, the state agency medical consultant, great weight. (Tr. 19, 300-14). The Court holds that the ALJ's RFC finding that Williams could perform a light range of work was supported by Dr. Altomari's opinion. Dr. Altomari found that Plaintiff had moderate limitations in her daily activities and in maintaining social functioning and concentration, persistence, or pace. (Tr. 311). Based upon these moderate limitations, Dr. Altomari opined that Williams could perform simple work instruction, maintain attendance and sustain an ordinary routine without special supervision, interact adequately with

peers and supervisors, and adapt to most usual changes common to competitive work setting. (Tr. 302). The ALJ found that Dr. Altomari's opinion was supported by a narrative explanation and generally consistent with the medical evidence. (Tr. 19). Therefore, the ALJ gave Dr. Altomari's opinion great weight and limited Williams to simple, routine, and repetitive tasks. (Tr. 16, 19).

In turn, ALJ also evaluated Dr. Spalding's opinion and found it was entitled to little weight because it was not supported by a narrative explanation and was inconsistent with the records as a whole. (Tr. 19). *Cf. Choate v. Barnhart*, 457 F.3d 865, 869 (8th Cir. 2006) ("A treating physician's medical opinion is given controlling weight if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'")(internal citation omitted). The medical records generally showed that Williams appeared alert, oriented, pleasant, and cooperative with normal speech, logical thought process, judgment and insight. (Tr. 15, 18-19, 287, 295, 298, 359-60, 384, 393, 396, 400, 404, 420). None of the medical records show that Williams had marked limitation in interacting with others. (Tr. 15, 19, 269, 287, 295, 298, 384). The ALJ also properly discerned that Dr. Spalding's GAF scores of 60 and 65 are contrary to the doctor's opinion. (Tr. 18-19, 397, 400, 404). *See Myers v. Colvin*, 721 F.3d 521, 525 (8th Cir. 2013) ("we have considered GAF scores in reviewing an ALJ's determination that a treating source's opinion was inconsistent with the treatment record").

The Court notes that the ALJ gave Dr. Spaulding's opinion little weight, but accounted for Williams' limitations to the extent that they were credible. (Tr. 16). Dr. Spalding opined that Williams had marked limitations interacting with others. (Tr. 415). Although the ALJ found that Dr. Spalding's limitation was not supported by the record, he restricted Williams to

superficial interaction with co-workers and the general public. (Tr. 16). Dr. Spalding also believed that Williams had moderate to marked limitation in performing complex work-related decisions. (Tr. 415). In turn, the ALJ restricted Williams to simple, routine, and repetitive work. (Tr. 16). Thus, the ALJ considered Dr. Spalding's opinion and included the credible portions of his opinion in the RFC. (Tr. 16, 19).

In addition to the medical opinions, the ALJ considered Williams' medical treatment. Upon review of the record, Williams sought treatment when her impairments were exacerbated by situational stressors, such as legal problems, family conflicts, and death. (Tr. 18, 244, 247, 251, 262, 285-86, 293, 402). *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) ("The medical record supports the conclusion that any depression experienced by Gates was situational in nature, related to marital issues, and improved with a regimen of medication and counseling."); *Banks v. Massanari*, 258 F.3d 820, 826 (8th Cir. 2001) (Substantial evidence supported the ALJ's discrediting plaintiff's claims of "disabling depression as inconsistent with her daily activities, particularly her level of church involvement, and as inconsistent with the her failure to seek additional psychiatric treatment."). Williams also sought treatment when she exhibited drug-seeking behavior as part of her addiction to Xanax. (Tr. 40, 251, 267-68, 270, 293, 295). Further, the ALJ noted that Williams had significant improvement after taking Seroquel. (Tr. 19). "'If impairment can be controlled by treatment or medication, it cannot be considered disabling.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Brown v. Astrue,* 611 F.3d 941, 955 (8th Cir. 2010)). Williams testified that she experienced great progress after going on Seroquel. (Tr. 36, 40, 42, 44-45). Thus, Williams' improvement with treatment did not support her allegation of disability. (Tr. 18-19). The Court holds that

Williams' minimal and conservative treatment does not support her allegations of disability. (Tr. 15, 18-19).

The Court holds that such objective findings constitute medical evidence to support a finding that a claimant can perform light or medium work. Although Williams alleged disability based upon mental impairments, Williams appeared alert, oriented, pleasant and cooperative, with normal speech, logical thought process, and intact judgment and insight according to her medical records. (Tr. 287, 295, 298, 359-60, 384, 393, 396, 400, 404, 420). Williams was assigned a GAF between 54 and 65. (Tr. 15, 18, 287, 397, 400, 404). The Court finds that Williams' medical evidence and GAF scores are consistent with the ALJ's RFC finding. (Tr. 16). The Court holds that the ALJ properly considered the medical records, which did not support Williams' alleged limitations, and found that Williams was not disabled.

Finally, the Court holds that the ALJ properly evaluated Williams' daily activities when determining her limitations. (Tr. 19). Williams claimed she had no daily activities and had significant difficulties interacting with others. (Tr. 195-215). However, the medical records revealed that Williams volunteered at a school bus barn and she was responsible for helping load children onto school buses. (Tr. 343). The ALJ properly noted that Williams' volunteer activity required greater ability to interact with others than she had alleged and supported the finding that Williams could have superficial interaction with others. (Tr. 19).

In sum, the Court holds that the ALJ properly evaluated Williams' credibility and found her allegations not credible. The ALJ evaluated the medical source statements, her treating physicians, the medical evidence and her daily activities, which do not support Williams' allegations of disability. The Court holds that substantial evidence supports the ALJ's finding that Williams could perform a range of simple work with limited interaction with others.

## VI. Conclusion

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **AFFIRMED**. A separate Judgment will accompany this Order.

Dated this 25th day of July, 2016.

_Ronnie L. White_
RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE